*LE Commodities, LLC v. United States*,
CIT Court No. 23-00220

## BIS Decision Document – Steel Section 232 Remedy Exclusion Request

**EXCLUSION REQUEST NUMBER: 343536**

**Summary:**

- Requester: LE Commodities LLC
- Product Description: Stainless Steel Round Bar Type 416
- HTSUS: 7222200062

**Analysis:**

On remand from the U.S. Court of International Trade, the Bureau of Industry and Security ("BIS") is deciding anew the exclusion request(s), referenced above, to exclude certain steel articles from the remedies (including quantitative limitations and/or duties, as applicable) set forth by the President in Proclamation 9705 of March 8, 2018, as amended, and in Proclamation 9740 of April 30, 2018 and Proclamation 9759 of May 31, 2018 and their accompanying annexes, in exercise of his authority to adjust imports under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862). Clause 3 of Proclamation 9705 and Clause 1 of Proclamation 9777 of August 29, 2018 authorized the Secretary of Commerce to provide relief from duties and quantitative limitations, respectively, upon request by a directly affected party and in consultation with other executive agencies as appropriate, for: 1) any steel article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality or 2) based upon specific national security considerations.

The above-captioned request for relief ("exclusion request") has met the requirements for consideration as a "complete submission" under Supplement No. 1 to 15 CFR Part 705.

BIS originally denied the request in a final decision dated March 26, 2023. LE Commodities filed suit in the U.S. Court of International Trade challenging the denial on October 16, 2023. On May 10, 2024 the Court accepted the Government's motion for voluntary remand to provide further explanation or reconsideration of its decision.

BIS and the International Trade Administration ("ITA") have reviewed this request anew and BIS is issuing this remand final decision in accordance with the requirements of Supplement 1 of 15 CFR Part 705 that were in effect at the time BIS made its initial decision, any relevant court remand instructions or procedures, and based on the following administrative record documents: the formal evidence and submissions provided by the parties during the original administrative proceeding (including the exclusion request and any objections, rebuttals, and surrebuttal filings, and any accompanying supplemental filings and confidential or proprietary business information), BIS's report to the President of January 11, 2018, the recommendation and analysis provided by the International Trade Administration (ITA) for this remand, and any interagency information as applicable to BIS's national security review.

In examining this request and evaluating whether the relevant steel article is produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality, the Department of Commerce has fully considered all of the evidence and information submitted to the administrative record. Based upon their review, ITA recommend denying this request for an exclusion.

BIS, having reviewed the record and ITA's analysis and recommendation on remand, adopts and incorporates by reference ITA's analysis and denial recommendation and finds that no overriding national security concerns require that this exclusion request be granted notwithstanding the recommendation of denial.

In reaching this remand determination, the Department did not directly or indirectly consider or rely upon any *ex parte* or other non-record information that may have been provided by or on behalf of any of the parties. The BIS decisionmaker on remand certifies that this remand decision is based exclusively on his independent review and consideration of the remand administrative records referenced above.

**Final Recommendation:**

The Bureau of Industry and Security recommends that the above-captioned exclusion request should be denied. This denial is without prejudice and the requester may file a new exclusion request for this product if, for example, new or different facts or circumstances exist which meet the criteria for approving an exclusion request.

**DECISION ON EXCLUSION REQUEST #343536**

| | |
|---|---|
| _____**X**_____ | I approve denying this exclusion request. |
| _____ | I do not approve denying this exclusion request. |
| _____ | I would like to discuss. |

*Eric Longnecker*                                                                          **August 7, 2024**
Deputy Assistant Secretary for Technology Security                              Date

# International Trade Administration (ITA)

**Recommendation Document for Denial of Steel Exclusion Requests Under Section 232**

Exclusion Request ID: 343536
Requestor:      LE Commodities, LLC (LE Commodities)
Objector(s):   Electralloy, a G.O. Carlson Inc. Co (Electralloy)
                       North American Stainless (NAS)

Recommendation: Denial
Rationale: At least one objector meets the quality, quantity, and timeliness criteria.

LE Commodities seeks exclusion for long, cold-rolled, stainless steel round bar type 416 per ASTM A582 and ASTM A484. Electralloy and NAS objected to the exclusion request. Pursuant to the relevant regulations, when an exclusion request has been objected to, "the U.S. Department of Commerce will review each exclusion request to determine whether an article described in an exclusion request meets any of the following three criteria: the article is not produced in the United States in an amount which can be delivered in a time period equal to or less than the time needed for the requester to obtain the product from their foreign supplier, is not produced in the United States in a satisfactory quality, or for specific national security considerations." *See* 15 CFR Part 705, Suppl. 1 at ¶ (c)(6)(i)-(iii) (Dec. 14, 2020). This ITA analysis review and recommendation is directed at the first two of these criteria.

"SATISFACTORY QUALITY" ANALYSIS:

Product Conditions

As part of its exclusion request, LE Commodities provided product information across multiple fields, including as relevant here, the product's commercial name, standards, classification and properties, specifications, and strength. In its objection, Electralloy certified that its "stainless steel bar is completely identical, interchangeable and fungible with the requested product exemption request" and that Electralloy could "meet all chemistry, physical and technical specification requirements . . .."

Notably, Electralloy's objection filing did not explicitly address whether its products met the ASTM A582 and ASTM A484 standards LE Commodities provided in its exclusion request. This omission could support the conclusion that the requested product is not domestically produced in satisfactory quality. However, "'not produced in the United States in a satisfactory quality' does not mean the steel . . . needs to be identical but it does need to be equivalent as a substitute product." 15 CFR Part 705, Suppl. 1 at ¶ (c)(6)(ii). Accordingly, ITA consulted a Subject Matter Expert (SME) to help ITA determine whether Electralloy's product met "the quality (e.g., industry specs or internal company quality controls or standards), regulatory, or testing standards, in order for the U.S.-produced steel to be used in that business activity in the United

1

States by that end user" and thus qualified as a "substitute product." 15 CFR Part 705, Suppl. 1 at ¶ (c)(6)(ii).

The SME noted that a manufacturer can conform to ASTM standards either by explicitly committing that the product conforms to the standards or conforming to each of the relevant specifications comprising the standard. The SME explained that a valid ASTM A582 specification requires a requestor to declare: the alloy, form of the product, condition (in this case annealed, intermediate temper or hard temper — all of which are heat treatments), finish (if the requestor has a requirement), dimensions, and cross-sectional shape. The SME stated that the ASTM A484 standard defines terms and tolerances for different shapes of stainless steel products and explained that a valid ASTM A484 specification also requires a manufacturer to define the condition of the product (heat treatment state). LE Commodities in its exclusion request did not specify, in the checkbox field or narrative comment, which condition it required. Accordingly, ITA finds that, because LE Commodities' invalidly cited the ASTM standards, Electralloy's failure to explicitly confirm that it could meet the ASTM A582 and A484 standards is immaterial. Additionally, we note that Electralloy's objection certified bit can meet all the technical requirements of the product "in all heat treated conditions." Thus, ITA finds that Electralloy's products met each of the specified product standards in LE Commodities' request.

Product Dimensions

In its rebuttal form, LE Commodities challenged Electralloy's product's quality and Electralloy's ability to meet all specifications in the request including dimensions. Electralloy in its surrebuttal continued to assert that it produces an identical product that meets all of LE Commodities' exclusion request's specifications.

LE Commodities submitted a public attachment with its rebuttal in which it challenged Electralloy's ability to produce the requested product. LE Commodities claims that Electralloy's website establishes that Electralloy does not have the ability to manufacture some of the sizes included in LE Commodities' exclusion request. LE Commodities cited only to a link of the opening page of Electralloy's website, https://www.electralloy.com to support its claim. For various reasons, ITA's practice is that mere citations to hyperlinks or website URLs are insufficient to incorporate all of the information contained on the website into the record.  First, as an initial matter, incorporating the entire website into LE Commodities' rebuttal supplement would far exceed the regulation's applicable page limitations for providing supplemental information.  Here, LE Commodities only referenced the Electralloy company website generally and did not submit specific information within the website to support its claims that Electralloy could not produce the requested product. Second, websites can frequently be updated and ITA does not have the resources or ability or obligation on behalf of a party to determine for that party what was or was not included the website's content at the time of the exclusion request. Specific website information, if it is to be utilized by a party, must be clearly identified and accurate and documented at the time of the exclusion request submission and submitted to ITA. Finally, even if ITA were to consider the website link provided by LE Commodities, there is no

evidence that the information provided on Electralloy's website would be an accurate and exhaustive list of all the products and sizes that Electralloy produces, nor whether the list of products has been updated or altered since the exclusion request was submitted. Thus, ITA concludes that LE Commodities' general link to a company website is not specific evidence of Electralloy's products and capabilities and, therefore, is not sufficient to contradict Electralloy's certified statements that it produces or could produce an identical product.

Cold-drawn vs. Cold-Rolled

LE Commodities' public rebuttal attachment also summarizes email correspondence with Electralloy that was also submitted as confidential business information (CBI). There, LE Commodities requested stainless steel cold-drawn round bar in sizes ranging 0.50" to 5" in diameter. Electralloy responded that it does not produce cold-drawn round bar. Thus, LE Commodities asserts that Electralloy's email response demonstrates that it does not produce the product in LE Commodities' exclusion request. Importantly, however, LE Commodities' exclusion request specified "cold-rolled"—and not cold-drawn as discussed in the CBI. For the reasons discussed below, we conclude that these are distinctly different products.

SME guidance was requested to evaluate the statements and documentation submitted by LE Commodities. The SME was asked to explain whether the product specified in the exclusion request is a cold-rolled product, or whether it is a cold-drawn product, and if the requested product can be manufactured without use of a cold-drawn process. The SME's guidance informs that cold-rolling and cold-drawing describe two distinct manufacturing processes -- and although the requestor could manufacture the requested product with either process, the two processes are not synonymous, and are not used interchangeably. More specifically, the SME explained that cold-rolling uses tools that are moving to deform the metal, and that cold-rolling can be used to manufacture a rod with the cross-sectional shape and size, mechanical properties, and alloy specified in the request. In contrast, the SME explained, cold-drawing pulls the metal through a die that does not move, but that cold-drawing can also be used to manufacture bars with the cross-sectional shape and size, mechanical properties, and alloy specified in the request.

The SME noted that the exclusion request specifies a round bar of type 416 steel with a diameter of 18 mm to 152.4 mm and a maximum Brinell hardness of BHN 262 that has been produced by "cold-rolling." The requested product is not described in the exclusion request as cold-drawn. The SME explained that many manufacturing processes can produce a product that meets the wide range of size and hardness specifications including, but not limited to, drawing and rolling. While the product could be produced through cold-drawing, that process is not required to meet these specifications. Furthermore, cold-drawn products contain unique properties such as the internal structure, surface finish, and internal stresses that are not required to meet the exclusion request's specifications. The SME explained that while it is possible to manufacture the requested product through cold-drawing, there is no physical or technological reason why cold-drawing must be used. Therefore, based on this information, ITA concludes that, even if

3

Electralloy does not produce cold-drawn bar, it does not necessarily mean that it cannot produce the product specified in the request.

The SME reviewed the exclusion request, rebuttal attachment, and rebuttal CBI, to evaluate and help evaluate the issue of whether the product in the rebuttal attachment and CBI is the same as the product in the original exclusion request. The SME noted that the product in the request is specified as "cold-rolled" with a maximum Brinell hardness of BHN 262, while the product in LE Commodities' rebuttal CBI is specified as "cold-drawn." The SME's opinion was that the cold-drawn specification is not indicated in the exclusion request and if LE Commodities requires that Electralloy use "cold drawn" it suggests a change to the requested product's specifications.

The SME noted that, as discussed above, the exclusion request's citation of ASTM A582 and ASTM A484 set three strength conditions which are not specifically identified in the request: annealed, tempered, or hard tempered. While the request does not specify a strength condition, the hardness specification corresponds to either an annealed or tempered condition, which the SME explained are achieved by heat treatment after cold-rolling. The heat treatment process would retain the shape achieved through cold-rolling. However, the SME further explained that while the requested product would retain the shape, it would not retain the internal state achieved by cold-rolling or cold-drawing after tempering. In contrast, the SME found that the rebuttal attachment and CBI pertained to a cold-drawn product, which is not in the same physical state as the requested product that has been heat treated. Thus, in the SME's opinion, the cold-drawn product discussed in the rebuttal attachment and CBI is not the same as the requested cold-rolled and tempered product in the original exclusion request.

In its surrebuttal form, Electralloy states "Yes" in response to the question of whether it is responding to LE Commodities' challenges to quality. Electralloy stated, "Electralloy can meet all delivery, quality, physical and technical requirements."

Based on ITA's analysis of the specifications of the requested product in LE Commodities' exclusion request, Electralloy's objection, LE Commodities' rebuttal, Electralloy's surrebuttal, as well as the SME's guidance, ITA determines that Electralloy's response to LE Commodities' email, stating that Electralloy could not produce cold-drawn bar, is not on point or relevant as to whether Electralloy produces or could produce the cold-rolled round bar product LE Commodities specified in the exclusion request. More specifically, ITA finds that LE Commodities' rebuttal documentation—where Electralloy confirms that it does not manufacture cold-drawn products—does not actually support LE Commodities' contention that Electralloy could not produce the cold-rolled product specified in LE Commodities' exclusion request. As the SME explained, a product bearing the same properties as the product LE Commodities requested can be manufactured through either cold-rolling or cold-drawing, and thus, ITA finds that Electralloy's statement that it does not produce cold-drawn products does not preclude its ability to produce the cold-rolled product LE Commodities specified in its exclusion request.

4

Additionally, LE Commodities' statements suggesting that the requested product must be cold-drawn appear for the first time in its rebuttal, -- the term cold-drawn does not appear in the exclusion request. Further, in the SME's opinion, the exclusion request does not request a cold-drawn product. In this exclusion request process, LE Commodities clearly cannot add new and different specifications to its request in a rebuttal. All specifications were required to be included in the exclusion request itself. Otherwise, after an objector objects, a requestor could simply change or add specifications, rendering it impossible for an objector to object to the new product and circumventing the structure of the exclusion request process. Therefore, ITA finds that if LE Commodities is attempting to change the specifications of its requested product to cold-drawn, rather than cold rolled, doing so during the rebuttal process is impermissible and thus, ITA does not regard it as a valid specification for this exclusion request. Furthermore, even if ITA considered this rebuttal specification as valid, it is not dispositive because the same product could be produced without cold-drawing.

In sum, ITA examines whether an objector's product matches the exclusion requestor's specifications when determining if the domestic product is of sufficient quality. Here, Electralloy's product meets all of the specifications that LE Commodities provided in its exclusion request, and thus ITA finds that Electralloy meets the quality criteria. Because Electralloy meets the quality criteria, ITA has not evaluated NAS' ability to meet the quality criterion.

"SUFFICIENT AND REASONABLY AVAILABLE AMOUNT" ANALYSIS:

Pursuant to the applicable regulations, as amended December 14, 2020, Commerce reviews the record to determine if the requested article is "not produced in the United States in a sufficient and reasonably available amount." *See* 15 CFR Part 705, Suppl. 1 at ¶ (c)(6)(i) (Dec. 14, 2020). "Not produced in the United States in a sufficient and reasonably available amount" means "that the amount of steel that is needed by the end user requesting the exclusion is not available immediately in the United States to meet its specified business activities." *Id.* "Immediately" means "that a product (whether it is currently being produced in the United States or could be produced in the United States) can be delivered by a U.S. producer 'within eight weeks,' or, if that is not possible, by a date earlier than the time required for the requestor to obtain the entire quantity of the product from the requestor's foreign supplier." *Id.*

Quantity

In its objection, Electralloy certifies that it can produce 100 percent of the requested volume within eight weeks. Electralloy answered "Yes" to the question in the objection form that asked, "Is the product type identified in the Exclusion Request currently manufactured by your organization in the United States, or can it immediately be made (within 8 weeks) by your organization, in a company-owned plant in the United States?" and "Yes" to the question that asked, "Does this organization currently manufacture, or can immediately manufacture (within 8 weeks), in a company-owned plant located in the United States a substitute product for the identified product that has similar form, fit, function, and performance?" Further, Electralloy

5

answers "100" to the question in the objection form that asks, "What percentage of the total product tonnage requirement covered under the Exclusion Request that is the subject of this Objection Filing can your organization manufacture at its U.S. plants on a timely basis?"

In its rebuttal form, LE Commodities states "Yes" in response to the question of whether it was challenging Electralloy's ability to manufacture the requested quantity, "Yes" to challenging Electralloy's ability to provide 100 percent of the requested volume, and refers to the public attachment it submitted with its rebuttal in support of its rebuttal arguments. The referenced rebuttal attachment discusses Electralloy's delivery time, but it does not discuss Electralloy's ability to manufacture the requested quantity.

ITA analyzed the certified statements submitted by Electralloy in its objection about its ability to manufacture the requested product and determined that, based on these statements, Electralloy can produce 100 percent of the requested volume. Additionally, ITA finds LE Commodities does not provide information to explain the challenge in its rebuttal to Electralloy's ability to provide 100 percent of the requested volume. Because LE Commodities did not provide any documentation or evidence to challenge Electralloy's certified statements, ITA finds, based on the information submitted, that it is appropriate to give greater weight to Electralloy' certified statements given that it is in the best position to know its own products, manufacturing abilities, supply chain, and timeframes.  Therefore, ITA finds that Electralloy currently produces or could produce 100 percent of the requested volume, and ITA has determined that Electralloy meets the quantity criterion.

Timeliness

With respect to the timeliness criterion, in its exclusion request LE Commodities reports 90 days in response to the request form instructions to "Estimate the number of days required to take delivery of the product covered by this Exclusion Request, from the time the purchase order is issued by your organization," otherwise known as the "2d" field. LE Commodities also reports 60 days in response to the request form instructions to "Estimate the number of days required to manufacture the product covered by this Exclusion Request, from the time a binding purchase order is executed." Finally, LE Commodities reports 30 days in response to the request form instructions to "Estimate the number of days required to ship the product covered under this Exclusion Request, from the foreign port of departure to the Exclusion Requester's loading dock," otherwise known as the "2f" field. ITA determines an exclusion requestor's delivery time adding the days a requestor provided in the 2d and 2f fields. The import delivery time is the time it would take for LE Commodities to obtain the product from another country to its manufacturing facility in the United States. ITA adds these two figures together plus any adjustments as necessary to arrive at the import delivery time. Here, adding LE Commodities' time to take delivery, 90 days, and then ship the product, 30 days, results in a total import delivery time of 120 days.

For Electralloy to meet the timeliness criterion, it must be able to deliver the product "earlier than the time required for the requestor to obtain the entire quantity of the product from the requestor's foreign supplier," *i.e.,* in a fewer number of days than the import delivery time. *See* 15 CFR Part 705, Suppl. 1 at ¶ (c)(6)(i) (Dec. 14, 2020). ITA determines an objector's delivery time by adding the days it takes for an objector "to ship from its U.S. manufacturing plant the product covered by this Exclusion Request from the time the purchase order is received," otherwise known as the "3b" field to the days the objector's "delivery time in days for the product covered under this Exclusion Request from the time it is shipped from your manufacturing plant to the Exclusion Requestor's loading dock," otherwise known as the "3d" field. In its objection, Electralloy claims a 3b time of 90 days and a 3d time of 3 days. Thus, adding these two figures together, ITA finds that Electralloy can domestically deliver the product to LE Commodities in 93 days.

LE Commodities submitted an attachment to its rebuttal, which contained a document entitled "Purchase Contract," which reports an "Issue Date" of October 23, 2022. The rebuttal attachment also contains a redacted "Commercial Invoice," which reports an "Issue Date" of December 6, 2022. The heading for the redacted section is also redacted. Finally, the rebuttal attachment contains a redacted "Bill of Lading" that reports an "On Board Date" of December 5, 2022. In the Bill of Lading, entries in the section below the "Goods Description" and "Stainless Steel Bars" is redacted. ITA notes that all three documents are dated within 90 days of the submission of the exclusion request on December 30, 2022, and thus will be considered. LE Commodities states in the cover letter of its rebuttal attachment that the dates of the contract and bill of lading demonstrate that LE Commodities' supplier manufactured the product that is the subject of the exclusion request in 43 days and, therefore, serves as the basis for LE Commodities' estimated manufacturing time of 60 days.

LE Commodities states in the attachment to its rebuttal that it "stated in its exclusion request that its foreign suppliers required 60 days to manufacture the subject merchandise and 45 days to deliver to the United States." However, LE Commodities' exclusion request reports 30 days to deliver the product to the United States and does not report a 45-day delivery time in any section of its request. The information that LE Commodities provided in its rebuttal attachment sets forth different timeframes for manufacturing and delivery than its exclusion requests, and the explanation provided in the narrative form of the rebuttal attachment does not explain the reason behind these multiple different figures. Furthermore, the Commercial Invoice and Bill of Lading contain redacted text that includes the headings of the redacted section. As a result, ITA cannot determine whether the redacted text contains specifications that can be compared to the product specified in the exclusion request. Therefore, ITA did not ask the SME to review the documents submitted in the public rebuttal attachment to evaluate whether the product matches the requested product because the contents of the redacted information are unknown and an unredacted version was not submitted by LE Commodities as CBI.

ITA will adjust the number of days reported in the exclusion request form to take delivery and then ship the product when warranted. However, in this instance, the documentation submitted

by LE Commodities as evidence of its claim that the requested product can be manufactured in 60 days and delivered in 45 days contains significant redactions that impede ITA's ability to determine if the product in the documentation matches the product in the exclusion request. Therefore, ITA finds that the documents do not support making an adjustment to LE Commodities' delivery time.

ITA also notes that, while LE Commodities states in its rebuttal that the requested product can be manufactured and delivered in 105 days, as opposed to the original import delivery time of 120 days reported in its exclusion request, both the original and the adjusted delivery times are longer than Electralloy's reported domestic delivery time of 93 days. As a result, any adjustments made by ITA to LE Commodities' delivery time would not change the results of its comparative analysis. Therefore, ITA finds that there is no basis to adjust the reported import delivery time as the validity of the documentation cannot be confirmed and, regardless, an adjusted delivery time would not impact ITA's comparison to Electralloy's shorter delivery time. Accordingly, in line with its practice, ITA is using 120 days, which is the total time to take delivery and then ship the product as reported by LE Commodities in its exclusion request, as the import delivery time.

Further, although LE Commodities argues in its rebuttal that its foreign suppliers require 60 days to manufacture the subject merchandise while Electralloy has an 87-day lead time, this argument focuses only on manufacture time. However, the relevant regulation requires consideration of the total time to both manufacturing and deliver the subject product, and LE Commodities does not account for delivery time in its comparison. *See* 15 CFR Part 705, Suppl. 1 at ¶ (c)(6)(i) (Dec. 14, 2020).

Based on analysis of the information provided by Electralloy, compared to LE Commodities' import delivery time as reported in its exclusion request, ITA finds that Electralloy can deliver the product in a timely manner. Therefore, ITA has determined that Electralloy meets the timeliness criterion.

Because Electralloy meets the quality, quantity, and timeliness criteria, ITA has not evaluated NAS' ability to meet the timeliness criterion.